Our first case for argument is Affordable Recovery Housing v. City of Blue Island. Mr. Starrett? Good morning. May it please the Court, my name is Noel Starrett, Counsel for the Appellant, Affordable Recovery Housing. Your Honors, this case is about saving lives from alcohol and drug addiction, and taking men off the street and giving them a home. If these men had been nuns, we would not be here today, because these men would have been allowed to stay in the Condon Building and the Catholic properties, just like the Manilet Sisters have been since the 1950s. These are existing buildings, and in 2011, the City allowed Affordable Recovery Housing to move in, start the operation, and the City was working favorably with Affordable Recovery Housing in terms of the remodeling of the buildings, the installation of a fire alarm system. They allowed the Manilet Sisters and Affordable Recovery to expend $130,000 to install a fire alarm system. They allowed men to move into the building. And then in May 2012, we had a Friday before Memorial Day weekend, we got a letter from the Chief Fire Chief saying, you've got five days to move all these men out, and unfortunately and tragically, four of those men whose fragile lives were in the process of their recovery lost their lives because they were evicted from the recovery home in which they were staying. I'd like to focus first... What happened to them? I believe the affidavit that we submitted, they overdosed on heroin, one in his mother's bathroom, one on the streets. I think one wife of one of the men threatened to sue Affordable Recovery for evicting her spouse. And so again, we don't know if they would have also passed away had they been in the recovery home, but we know that given the fragile nature of men in recovery, this was the situation that we had. We had men in recovery. We were operating, and while the situation was very friendly with the municipality, the mayor was very supportive of the ministry, and Mr. Dunleavy, who's the CEO of Affordable, was working hand-in-hand with the building commissioner saying, well, here's what we think we should do, here's our plan, here's our proposal. The building commissioner was saying, no, prioritize the fire alarm because that's the most important thing. The Manolet sisters scraped together $130,000. They installed these fire alarms. Again, these are existing buildings. This is a convent that the Manolet sisters are currently staying in. And again, if these men were nuns, we wouldn't be here today. The nuns are still in the property, and the zoning allowed for a convent. Really, we were just allowing these people with their disability, with the alcohol and drug addiction, to provide the same home, the same safe place off the streets for them to stay. Are you just seeking attorney's fees? No, we are seeking damages, Your Honor, and I think there's really one component that I'd like to stress. But the attorney's fees also? Yes, attorney's fees also. Frankly, because had the attorneys not gotten involved, particularly my co-counsel, Mr. Mauck, who litigated this case below, this ministry would never have reopened. Because Blue Island, even after we were licensed by the state in September 11, 2013, and the district court held that we had no obligation to retrofit the building. That's what the district court held. Even after that point, for over a year, Blue Island still didn't let us reopen the home. And so had the attorneys not gotten involved, this ministry wouldn't be here. But you prevailed under state law, correct? Yes, I believe so, yes. We see combinations of state laws and federal claims with fee-shifting statutes. They're combined fairly often. For example, one might imagine an excessive force case against a police officer and his employer in the city where you could wind up with prevailing on the state law claim but losing on the federal claim. In those situations, have we awarded or authorized the award of fees before? And I think that's what the district court was saying, is that upon its reading, no. And I think that's my struggle. I'm asking you. No, not that I'm aware of. I would point to the Supreme Court decision, the Texas case, Big Island, because that points to the fact that we succeeded on a major part of the litigation. You're relying on the Southwestern Vail case you're referring to? Yes. I read that, but I just am a little surprised that we don't have more law addressing this because I would think this would come up fairly often if it were allowed. I think the case is where you've succeeded on a state claim, but the court did not reach the federal claims. And I think what the district court was saying is that because he went ahead and reached all the federal claims and threw all of those out, that we weren't entitled to fees because we didn't have a fee sheet. Now, it's not exactly the same thing because you're seeking additional relief under federal law that you could not obtain under state law, correct? You're seeking the damages that might be available under ARLUPA. You're seeking Fair Housing Act relief, right? Yes, Your Honor. And all that's quite different from the narrow state law claim on which you prevailed and on which state law does not provide for fees, right? Correct. Okay. And going back to the substantial burden, I think I would like to focus the time I have on the substantial burden analysis because under any test that this court has recognized, let alone what the Supreme Court has applied in both the Hold case and the Hobby Lobby case, I believe it is a substantial burden on a ministry to shut it down after it's already operational. And I think that that's what this court recognized in the World Outreach Decision is when you deny an organization the use of its building to accomplish its objectives, that can't be said, I think in the court's words, to be an insubstantial burden. And I think that that's clearly met here. You've been spared the sprinklers, right? Yes. Now, do you have any other protection against fire? Yes, there are ample protections against fire. Again, we had Edward Young, the architect. We brought him immediately into Blue Island and said, look, we have non-combustible buildings that have been extant since 1950. You grandfather all these buildings in if it was just the convent. Again, if these people were nuns, we wouldn't be here today. Furthermore, we have fire watches. We installed $130,000. Wait, what's a fire watch? I believe this is where we had men on each floor that were up at night, and essentially they were there to monitor whether or not there were fires. And men on fire watch are a lot more sensitive to a fire than a sprinkler. Again, the expert testimony in this case by Edward Young was that it was. . . I mean, they're sleeping in bedrooms, but they're being alert? No, not all the men are sleeping. I think that's the fire watch aspect. So they stay up all night? That's the way I understand it, yes. And frankly, the building commissioner also said. . . These are inmates that are. . . No, not all, no. I think very few of them are ex. . . You think or you don't know? No, no, most of them are not. Are they people who are resident there that are on alert, fire alert? Yes. And so most of them are just in alcohol drug rehab, and they're there to provide a safe place where they would otherwise be on the street. And the Manolet sisters, in accordance with their beliefs, said we have fewer and fewer nuns and we have 120,000 square feet of space. We have this convent building where we don't have enough nuns to fill the rooms. We have a residential high school building, affordable recovery. Please bring these men in. The mayor was on board. Everything was going fine. And I would like to point out that the city has not challenged the district court's ruling that we had no requirement after September 11, 2013, to install sprinklers. But nevertheless, we still have a 14-month period after that. The Blue Island kept us from reopening the ministry. That's while you were litigating the state law preemption issue, right? Right, which we wouldn't have had to litigate had Blue Island not opposed us in terms of reopening. Is that what the damages you're seeking are about? Yeah. The closure of the building for 14 months. Well, for the entire time. Right. Yeah, essentially taking a ministry that was operational and another part of the damage component is not just the damage to the ministry that had to shut everything down, kick all the men out, but it lost all of its connections with the various referral sources that it had, the linkage agreements between the various sources that they received the men from, that they find out about these men. And I see I'm going into my rebuttal time, so perhaps I'll leave it there. Have the damages been calculated? Are they up in the air or what? Well, the damages are – I don't believe we have a specific calculation because part of it is difficult to calculate because it's a matter of the aggravation and inconvenience that we have. And what we could show in terms of the funds we were receiving in 2011 from the various sources to what we were receiving when we were able to finally start, because some of it's difficult because we were only allowed to start after the court entered its ruling on November 2014. With that, I would like to resume. Mr. Sterritt, I'd like to ask you a couple more questions. Please. So that the plaintiff or defense has an opportunity to hear your answers. First of all, the fire chief's letters from May and early June of 2012, do you disagree with the facts stated there? We disagreed with its application of the 2012 sprinkler code, and I believe in our brief we identified each fact that we disagreed with. And he was arguing that we need to install the sprinkler system, we had to move all the guys out, and treating us as a new development. This is not a new development. Okay. As I understand it, the fire chief was saying that you all had failed to comply with the five-year plan that you'd worked out with the city. Yes, and I think that that point needs clarification because we do disagree with that because what we ended up doing was we submitted a proposal. Mr. Dunleavy and the Manolet sisters went to the building commissioner and said, here's what we're trying to do. Here's our phase-in program. It's going to take us some time to accomplish each step. And Mr. Miniman, upon receiving the plan, says, well, if you're going to move men in, prioritize your fire alarms because that's most important. And that's what we did. So we had a plan or a proposal, but the city even acknowledged that that wasn't some type of binding contract. It was just our phase-in plan in terms of how we plan on going about this. Let me try to make the question a little more pointed. Sure. But for the state law preemption issue, were you in violation of the city fire code as of May 2012? No. We argued that since we had begun our use in 2011, that the 2012 code, which they had just passed that March, didn't apply to us. Furthermore, we were using it. But you thought you could expand use indefinitely under the old code or what? Yes, as illegal nonconforming use. We considered what we were doing to be effectively the same thing. Nuns could go in there and sleep. Could you expand from 20 residents to 100? Well, our argument is based on the space and the rooms available. In other words, not based on the number of heads. In other words, if the convent has 120 rooms, even if the convent loses a lot of nuns through whatever, if they find a different order or whatever, we're arguing that the space was there, it was extant. Let's try it. Okay. I don't know that this court is really the court to enforce the details of the city's fire code, okay? Sure. And what concerns me is that you all are pursuing legal theories that seem to allow you to negotiate each line of the fire code to the extent you find it inconvenient or expensive to comply with. And the district judge obviously was troubled by that prospect. Could you give me some comfort on that? Yeah, no. We weren't trying to. It was our plan to install sprinklers, and we weren't trying to negotiate line by line. We were just operating the material. Could you address the broader legal implications of your argument, which I understand to be that you could challenge, under the Illinois Religious Freedom Restoration Act, any detail of the city fire code that you found inconvenient or expensive to comply with? No. It has to be much more than an inconvenience. It has to rise to the level of a substantial burden on your religious exercise. Okay. Well, this gets to a pretty fundamental problem for me in the case because, as I understand what happened here, there's the prospect. You could choose to comply with the law, or you could choose to violate the law. And in the violation of the law, then the city enforces it and says, we're going to evict you. You guys have to get out. I thought when we were measuring substantial burdens, it was a substantial burden of complying with the law, not substantial burdens imposed by enforcement in the case of a violation. No, I believe in the Holt v. Hobbs case, which prohibited the individual from growing a beard, the same would be in this case, where they're prohibiting us from engaging in our religious exercise. No, no, no. They're saying if you want to do this, you simply have to have sprinklers. Have to have what? Sprinklers. And we weren't arguing that we wanted to be. In 2012, when we went before the city council and the Zoning Board of Appeals, we weren't arguing to be exempt. We said, you've shut our ministry down. Please allow us to keep men in recovery, because that's the only way we obtain funds. Allow us to keep men in recovery as we have. Are you understanding, counsel, the difference I'm asking about between a burden in complying with the law versus a burden in violating the law and having enforcement action taken against you? Sure, and I think both RFRA and RLUIPA focus on the impact of the regulation on our religious exercise. With respect to compliance or violation? I think it's both. Why? Because that's the way in which the statute, as I read it, is the application of any law which restricts the religious exercise. All right, let me give you a wild hypothetical then. Okay. A minister wants to carry out his ministry and is short on funds. He decides to carry out a couple of robberies to get the funds, to get the money needed for his ministry. He's arrested, convicted, sentenced to, let's say, five years in prison. He argues in sentencing, this is imposing a substantial burden on my ability to exercise my religion. Really, one year in prison would be more than sufficient to serve the state's needs. Yes, I don't think that that would be a legitimate claim under the RFRA. Why not? I honestly can't think of why that wouldn't be, but I don't. I would think it follows from your logic that it is a substantial burden. That is, the state's punishment to him for violating the law of general applicability is more severe than needed to serve the state's purposes. And it has the effect of limiting his ministry for four years where it otherwise would be available. Well, if the court believes it's a substantial burden, then I'm trying to figure out where. If that's where your logic leads, there's a problem. If you can tell me where that logic falls apart, I would welcome that. Yes, I'm just looking at the impact of what happened in this situation. We had an existing ministry that was operational and had no requirement to install sprinklers after September 11, 2013. And so if the district court's opinion is upheld, what that would mean is that the municipality can take a land-based regulation that doesn't even apply to us, keep us from doing what we're doing, and shut us down. And in terms of the facts of this case, again, I don't get much into the criminal law, and I don't know its applicability as to RFRA in that situation. But my time is clearly up, and I think I've eaten all my rebuttal time. Okay, thank you, Mr. Stern. Mr. Welch? Good morning, Your Honors. May it please the Court. My name is Emmanuel Welch, and I represent the defendants' appellees in this case, the city of Blue Island and the fire chief, Jim Klinker. This case is before the Court of Appeals after Judge Dow granted defendants' motion for summary judgment on every single federal claim, and the only claim he didn't grant in our favor was a state law preemption matter. Questions of law we know are reviewed de novo, but when we look at the entire record in this case and look at the precedent that this particular court has entered, we believe that the district's court's grant of summary judgment should be affirmed for six reasons. First, enforcement of the Blue Island Fire Code, including the related eviction in May of 2012, did not substantially burden affordable recoveries religious exercise under the Illinois Religious Freedom Restoration Act. Second, the Religious Land Use Institutional Persons Act did not apply in this particular case to the Blue Island Fire Code, as the Fire Code is not a land use regulation as defined by this court in several precedents. Third, the city's zoning code for obtaining a special use permit did not substantially burden affordable recoveries exercise of religion. Fourth, as Judge Dow correctly noted in the record, that even if there was a substantial burden, enforcement of the Fire Code, the Fire Code was in furtherance of a compelling governmental interest, and it was the least restrictive means of furthering that interest, as it was based on the National Fire Safety Code. I have to say, that logic escapes me, but we'll talk about that after you finish your list, okay? Thank you, Your Honor. Fifth, affordable recovery, Your Honor, was not entitled to prevailing party fees because they did not prevail on any of the constitutional claims, any of the fee-shifting claims. And sixth, affordable recovery was not entitled to an exemption under the Fair Housing Act just because of a lack of financial resources. This court has ruled in several precedents in the Seventh Circuit that financial resources is not an issue when it comes to an accommodation. That's not a disability. On the least restrictive means, I'll take this a little bit out of order, but I'll just tell you, I don't understand why the national standard is deemed to be minimal, particularly since we have the State of Illinois, for starters, saying it's not necessary to have sprinklers in these buildings, right, for fire safety purposes. Well, I think we have to take it in two phases. First, when affordable recovery was first allowed into the property, they were allowed in as a small entity. They only were approved for 14 people. And so when they went above that, that brings in a whole different realm of law related to large facilities. And I think it's very important, because there's admissions throughout the record from affordable recovery, that there were 73 men living in this space that no one knew, no one gave approval for, and they didn't have a license for at the time, Your Honor. I get that. But since the State of Illinois has presumably the same compelling governmental interests and is satisfied with other fire safety measures that do not include sprinklers here, I find it difficult to accept the idea that nothing less than full enforcement of the Blue Island Fire Code would suffice. I mean, we're talking about strict scrutiny under constitutional standards here. Correct. And that's a tough standard to meet. It is a tough standard to meet. And we don't believe. And you all were willing to let them go for a while without sprinklers, right? Blue Island was working with affordable recovery when they were a small facility, when there were only 14 people. When they became 73 people in there without any permits, approvals, or a license from the state. Without any what, I'm sorry? Without any license, permits, or approvals, Your Honor. The record is clear that they didn't get a license until September of 2013, well over a year after the fire chief had discovered that somebody had. How does that connect with the sprinkler issue? Or is it separate? The fire chief was really concerned. Blue Island was working with them. When they were a small facility, they were treating them like they treated everyone else in town. They were working with them and trying to give them time to get the sprinkler system in place. But when the fire chief did an inspection in May of 2012 and found 73 people living there without anyone's permission, without any, without any license whatsoever, this was truly a dangerous situation. They were living in a space that was never a residence before. This property owned by the Mother of Sorrows, the sisters, is five different buildings. And where the nuns currently reside, they were residing in 2012. Where the 73 men were residing, they were living on mattresses on floors in old classrooms in a building that used to be a school. This building wasn't meant for overnight residence. And the fire chief comes in and there's 73 people by affordable recovery zone admission living there overnight. We just believe that Judge Dow got it right when he said that enforcement of the Blue Island Fire Code, including that particular eviction, did not substantially burden affordable recovery's religious exercise. Judge Dow cited this court's ruling in the first World Outreach versus City of Chicago case in 2009 when he said that requiring a sprinkler system, Your Honor, was not a substantial burden. If anything, it was a modest one. Requiring a what? Requiring a sprinkler system, Judge Dow noted by citing the World Outreach case from 2009. Was that in World Outreach? Well, in World Outreach, we dealt more with... It wasn't sprinklers. It wasn't sprinklers. It was the designation of the building being a landmark. But the building could still be sold or rented, and Judge Dow pointed that to. This building could still be used. They just couldn't use it overnight. They couldn't stay there overnight. Council has stated repeatedly here today that Blue Island prevented them from using their property. There is absolutely nothing in the record that says they could not have used this building during the day to offer counseling to these men. There's nothing that says they couldn't have had worship services on the property during the day. If they did that, would there have to be sprinklers? Well, based on my understanding of the fire chief's concerns, it was the overnight accommodations where sprinklers would have been needed for safety purposes. During the pendency of this, I believe the City of Blue Island would have worked with them without sprinklers if they were still using their property during the day. I think daytime hours was not the issue. But their issue was overnight accommodations and collecting fees off the men who stayed there overnight. We also believe, Your Honor, that Judge Dow got it right when he found that the Religious Land Use and Institutionalized Persons Act does not apply to the Blue Island Fire Code as the Fire Code does not constitute a land use regulation as to bring plaintiff's claim within the regulatory scope of the Religious Land Use and Institutionalized Persons Act. He specifically pointed to this court's definition that you laid out in 2006 in Vision Church versus the Village of Long Grove. In that particular case, you dealt with an annexation law and specifically found that the use of that annexation law, that was not a land use regulation. And similarly here, the Fire Code is not a land use regulation. We also believe that Judge Dow got it right when he found that the City's zoning code requirement for obtaining a special use permit did not substantially burden affordable coverage exercise of religion. We've heard counselors talk about if this was the nuns, we wouldn't be here. If this was the nuns. This case had nothing to do with their religion. As this court cited in Civil Liberties for Urban Believers, the club case versus City of Chicago in 2003, the Religious Land Use and Institutionalized Persons Act does not provide religious institutions with immunity. They are not entitled to a free pass or any type of special treatment. And that's what we believe Affordable Recovery is asking this court to give them, special treatment. As Judge Dow correctly noted in the record, Affordable Recovery was treated like everyone else who's come before the City of Blue Island, including a non-religious women's shelter that had looked into the Mother of Sorrows property before Affordable Recovery did. They were treated exactly the same given the exact same advice. Religion had nothing to do with it. And I think it's also very important to underscore the fact that the City of Blue Island actually did approve Affordable Recovery's special use permit when they went through the process. I think it's important to know that had they done everything they were supposed to do, the city was working with them. No one knew that Affordable Recovery was moving 73 men into a location that had never been used as an overnight residence before. Only Affordable Recovery knew that. Your Honor, I want to also address, before my time is up, the issue with regard to prevailing party fees. We believe that Judge Dow got it right when he found that Affordable Recovery was not entitled to prevailing party fees because they did not prevail on one single constitutional claim. They only prevailed on a state law preemption matter. And that was only because the State of Illinois issued a license in September of 2013 well over a year after this case had already started in this building. So why did you guys fight him for that next year? There was still a question of whether we apply state law or local ordinance. Even everyone had that in doubt because there was a dispute between local ordinance and state law. And once Judge Dow issued his order saying that state law preempts the local ordinance, they were allowed to move back in. But that's a state law. They were allowed what? They were allowed to move back in and resume. Without a sprint. Without having to put in a sprint. That's correct, Your Honor. But that was based purely on state law that didn't have a fee-shifting provision in it. It was a question of law. It was a deck action, pretty much, that could have been brought in state court. If it wasn't for the federal claims, they wouldn't have even been in this building. So we believe the court's reliance on Supreme Court precedent from 1980 in the Maine v. Thibodeau case. The major purpose of 42 U.S.C. section 1988 is to benefit those claiming deprivations of statutory, constitutional, and civil rights. We don't have that here. We had a state law preemption issue, and not any of their federal claims were granted, and we believe they were not entitled to attorney's fees. We would ask that Judge Dow be affirmed on that matter as well. And finally, Your Honors, we believe that Judge Dow got it right when he found that a formal recovery was not entitled to exemption from the Blue Island Fire Code under the Fair Housing Act. I think we even heard the argument, again here this morning, that affordable recovery didn't have the money to put in the sprinklers because they didn't have 73 men living in a place that wasn't a residence before, and they needed the financial resources from that to put in the sprinklers. Well, this court has specifically said in Hemisphere Building Company v. The Village of Richland Park in 1999 that a municipality does not have to adjust its zoning or safety regulations for purposes of the Fair Housing Act where the requested accommodation is based on financial resources. And I think that's what we have here, a party that was seeking, because they didn't have the money, we want an accommodation. It had absolutely nothing to do with the disability whatsoever. And I think what's really important to underscore, Your Honors, before I take my seat, is that this all could have been prevented had affordable recovery done what it was supposed to do and complied with the laws instead of building their business. Just as they did when they applied for the license with the State of Illinois and got their license in September of 2013, had they done that earlier, this wouldn't have been an issue. This was an organization looking for special treatment. And as this court has said on numerous instances, just because you're a religious institution does not entitle you to a free pass. We do not believe affordable recovery was entitled to a free pass. And we ask that, Your Honor, for all the reasons stated here and in the record, that Judge Dowd be affirmed on all matters. Okay. Thank you, Mr. Welch. Thank you so much. Mr. Sterritt, do you have anything further? I would, with the time I do have. I would like to address one key thing. The city has painted us as an organization that didn't try to comply with what we were required to do. We went to the Manalit Sisters. We had the meeting with the mayor, the building commissioner. The mayor said, Move 14 guys in. Go ahead. The Manalit Sisters, their property was being vandalized. They needed people there to provide security. Affordable recovery moved in. Everything was friendly. They put together the plan with the Manalit Sisters. Here's our phase-in program. They were meeting regularly with the building commissioner. What do you want me to do? How do you want me to do it? The building commissioner says, Prioritize the fire alarms. That's the most important thing. This is an existing building. Go ahead. Move 40 guys in. Once they approved the fire alarm system, the fire chief came back and the building commissioner came back, inspected the property, gave them the blessing to move 40 men in. This characterization is if we weren't trying to work with Affordable. The problem is sometime around the time— Well, Mr. Welch expressed concern about the 73. Right, Your Honor, and I don't think we have—we do. The affidavit of Mr. Dunleavy is that they had permission from the building commissioner to move 40 men in. But the issue is not whether or not Blue Island— What about the 73? They were moving more men in. They had all the space. They had all the beds. So I'm not saying that we had permission to move the extra 20 people in. The eviction that came didn't say, Oh, by the way, take those 20 extra men that you've moved in. 33. 33. Thank you. Just three to count. Yes, sorry. Please take the men that were not authorized to move them out. What they said is, Remove everybody. Remove everybody from the building. All the people that were in recovery, they were already there. And that's what we're—it's the manner in which they imposed it that RLUIPA is focused on. It's not just that we have a sprinkler regulation, but RLUIPA says you must focus on the manner in which it's imposed. And we were saying, Look, for a year you've led us on. We've spent $130,000 meeting with the building commissioner's direction as to what you want us to do. We have a non-combustible building. There's really no immediate need for a sprinkler system. The nuns have been there. The convent has been extensive since the 1950s. And we need to be able to have the men in there. Otherwise, you'll never see a sprinkler system in the building whatsoever. And so our— Mr. Welch said that with the 73, it was too crowded and dangerous and so on. Do you have any comment on that? There's simply no evidence of it. We've got 120,000 square feet. We've got a full convent building, a full high school building. They produce no evidence other than a— Where were the 73? Excuse me? Where were the 73? I believe in Building C and D is where— They were in two buildings? In two different buildings. D is the residential high school building, and C is the convent building. So there are some rooms that were already existing rooms. And they slept there? Yeah, they had—I believe they were able to get mattresses. What did they sleep on? Mattresses. I believe they were able to get mattresses in. Who got the mattresses? Mr. Dunleavy. I don't require the source of the mattresses, but the mattresses were brought in in a day. Again, a lot of these people would otherwise be in the street, and so giving them a safe place on a 6.7-acre parcel— Where did the mattresses come from? I don't recall the exact source of the mattress, but he was able to, through his connections, get a place to donate the mattresses. But was it Affordable that supplied the mattresses, or the 73 brought their own mattresses? No, I believe Affordable provided them. I don't know what mattresses existed or how many of those 73 were existing beds or supplemented. I don't recall that from the record, Your Honor. And really that's what we're arguing is that our religious exercise, we were already in operation, and we were already in operation with the blessing of Blue Island. The problem is during the informal period, while everybody was operating on a friendly basis, that changed for some reason, and the mess that we are now in is essentially Blue Island trying to put the toothpaste back in the tube and to say, oh, well, rather than requiring you in 2011 to try to comply with every jot and tittle of their code, we're going to force you to do it now, and you've got to start from scratch, and we're going to kick all your men out, regardless of how fragile they are or where they're in in recovery or how this is going to devastate your ministry. The judge criticized you for a delay in seeking a state license. Do you have any comment on that? No, I think, unfortunately, the attorneys didn't... I don't know if getting the attorneys involved earlier would have been better, but I think in some respects getting the attorneys involved better would have been helpful because of... You said the linchpin of that victory, your victory, was the granting of a state license that plaintiffs certainly could and probably should have sought long before it commenced this litigation. Right, and I think we had to work and get things squared away with the municipality before we could get things squared away with the state. Why? That's my recollection, because the state was... I'm foggy on the record as to... But a state license is going to preempt a local ordinance. Sure, and we applied for it, but I think there was some delay as to whether or not... what our program looked like and what the municipality's position was. That's my only recollection, Your Honor. And for the reasons set forth today and also in our brief, we would ask that this court not only reverse the district court but also find that Blue Island substantially burdened Affordable's religious exercise... Do you think we should grant summary judgment on disputed facts? We believe that there are sufficient undisputed facts because there is not... Did you move for summary judgment? Yes, we did, Your Honor. All right, thanks. Thank you, Your Honor. Okay, well, thank you very much to both counsel.